1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                        EASTERN DISTRICT OF CALIFORNIA

10

11  GEORGE MARLIN KNIGHT,              NO. 2:04-cv-2054-MCE-GGH

12            Plaintiff,

13       v.                           MEMORANDUM AND ORDER

14  NATIONAL AERONAUTICS AND
    SPACE ADMINISTRATION,
15
              Defendant.
16
                           ----oo0oo----
17

18       In the present action, Plaintiff George Marlin Knight

19  ("Plaintiff") sues the National Aeronautics and Space

20  Administration ("NASA") for NASA's alleged noncompliance with

21  Plaintiff's requests for information pursuant to the Freedom of

22  Information Act, 5 U.S.C. § 552 ("FOIA").  NASA now moves for

23  summary judgment in its favor, and alternatively requests that

24  the Court dismiss Plaintiff's lawsuit for lack of subject matter

25  jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and

26  12(h)(3), because of mootness, on grounds that NASA has fully

27  satisfied Plaintiff's informational demands.

28  ///

                                  1

As set forth below, because the Court grants summary judgment for NASA it need not address NASA's alternative request for dismissal.[1]

**BACKGROUND**

The Mars Exploration Program is a series of space-flight projects administered for NASA by the Jet Propulsion Laboratory ("JPL") near Pasadena, California.[2]  One of the Program's projects is the so-called Mars Exploration Rovers Project ("MER Project"), which since 2000 has engaged in gathering scientific data through the use of "rovers", or instrumented robotic grounds vehicles, on Mars.  "Spirit" is the name of one of the rovers used to explore the Martian surface.

Rovers are designed to gather scientific data, but must also be able to locomote, avoid hazards, deal with emergencies, keep their batteries charged, recover from failures and otherwise survive to carry out their scientific data-gathering mission. Rovers include various scientific and engineering devices designed to accomplish these objectives.  The Spirit Rover has exactly seven scientific devices, including two panoramic cameras, as well as seven engineering cameras.

///

///

---

[1] Because oral argument would not be of material assistance, the Court ordered this matter submitted on the briefs.  E.D. Cal. Local Rule 78-230(h).

[2] The California Institute of Technology operates JPL under a contract with NASA.

Information collected by the Spirit Rover is transmitted on radio signals (known as "telemetry") directed to antenna complexes in Barstow, California, Canberra, Australia, and Madrid, Spain. Collectively the three complexes constitute the so-called Deep Space Network ("DSN").  Following receipt by the DSN, the telemetry data is forwarded via ground communication data lines to JPL, where it is stored in packet format as a datafile or "spooler".  The packets are then processed into "data products" housed on Operations and Science Storage Servers ("OSSs"), where they are initially aggregated into Experiment Data Records ("EDRs").  Payload Downlink Leads ("PDLs") monitor the flow of data organized in this matter by producing a PDL Report or downlink report.  Those reports cover the information generated by Rover instruments and devices for each Martian day. Ultimately, further processing results in a second order digital product known as Reduced Data Records ("RDRs").

On or about June 10, 2004, Plaintiff made a request to NASA, under the FOIA, for data obtained by the Spirit Rover from Mars. That request, which sought receipt logging procedures for the information being received from Mars, read in pertinent part as follows:

> I am requesting copies of the procedures followed to log the receipt of data and images from the instruments of the Spirit Rover including:
>
> 1.  Miniature Thermal Emission Spectrometer (Mini-TES)
>
> 2.  Mossbauer (sic) Spectrometer (MB)
>
> 3.  Apha (sic) Particle X-Ray Spectrometer (APXS)
>
> 4.  Panaramic Camera
>
> 5.  Navigation Cameras

1      6.   Hazcams

2      7.   Microscopic Imager

3          I am not requesting the actual data or images.  I am
       requesting the procedure manuals or instructions which
4      specify what the employees and contractors do to record the
       log data and images received from the Spirit Rover.

5

6  In addition, Plaintiff submitted a second request to NASA, also

7  on or about June 10, 2004, for logs recording the receipt of

8  data, from the aforementioned Spirit Rover instruments, for a

9  time period encompassing the first thirty-three Martian days

10 following the Spirit Rover's touchdown on Mars.

11     According to Plaintiff, an attorney representing himself in

12 pro se, he intends to use the Spirit Rover data to publish

13 articles about Mars and NASA's handling of data from Mars (Pl.'s

14 Amended Opp. 7:6-8).  Plaintiff's motivation in seeking the

15 information centers around the contention that "many

16 knowledgeable people ... think that NASA is simply not telling

17 the truth about Mars", and that there is in fact "abundant

18 evidence of life, including past intelligent life, on Mars".

19 (See November 8, 2004 email from Plaintiff to NASA's counsel in

20 this action, Exhibit 2 to Defendant's Notice of Motion filed

21 herein).

22     No records were initially produced in response to

23 Plaintiff's FOIA requests because the two requests were

24 interpreted as being identical, and because JPL determined that

25 there were no responsive receipt logging procedure records.

26 Ultimately, however, JPL's FOIA Officer realized that receipt

27 logs were also sought in addition to records pertaining to

28 receipt logging procedures.

4

1   Thereafter, Jim Erickson, the MER Project Manager for JPL, along
2   with the MER Project Data Operations Team, and Software Engineer
3   Kyran Owen-Mankovich, determined that certain telemetry
4   information received by the DSN was responsive to the receipt
5   logs request.  JPL personnel concluded that the DSN was the only
6   likely source of this information, which was extracted from
7   instrumentation data packets.  NASA subsequently produced
8   information for the first thirty-four Martian days from all
9   Spirit Rover scientific instruments, plus all engineering
10  cameras.  NASA further released the Application Process
11  Identifier ("APID") numbers which identified the
12  devices/instruments responsible for generating particular subsets
13  of information.
14      In addition to the telemetry receipt log information, the
15  MER Project Principal Investigator, Steve Squyres, Ph.D, and the
16  Project's Deputy Principal Investigator, Ray Arvidsen, Ph.D., who
17  are professors at Cornell University and Washington University in
18  St. Louis, respectively, both determined that the Spirit Rover
19  PDL reports were also potentially responsive to Plaintiff's FOIA
20  receipt logs request in that they record the process of
21  monitoring and collecting "raw" data products, even if they do
22  not record the initial receipt of the data itself from Mars.
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

1    Although other MER Project staff disagreed on various grounds,

2    NASA ultimately decided to give Plaintiff the benefit of the

3    doubt by releasing the PDL reports and manuals, with redactions

4    as detailed in a Vaughn Index[3] spreadsheet.  Certain filepaths

5    and other information was withheld for security reasons, in that

6    dissemination could potentially aid unauthorized use of the JPL

7    computer systems.  Names, initials, email addresses and telephone

8    numbers were also deleted due to privacy concerns.

9         With respect to the receipt logging procedure records, once

10   NASA determined that PDL materials should be provided to

11   Plaintiff it also decided that MER PDL procedures documents

12   should also be released.  The Declaration of David Lavery

13   establishes that after consultation with other MER Project

14   officials about the MER Project data flow, he determined that no

15   other categories of agency records should be responsive to the

16   receipt logging procedures request.  Lavery Decl., ¶ 49, 50, 59,

17   62.  Eight documents were ultimately identified as responsive and

18   were produced after redaction for security and privacy concerns.

19        Following production of the aforementioned materials,

20   Plaintiff remained dissatisfied with NASA's response to his FOIA

21   requests and instituted the present lawsuit.

22   ///

23   ///

24   ///

25   ────────────────────

26        [3] A so-called "Vaughn Index" must identify each document
     withheld pursuant to a FOIA request, state the statutory
27   exemption claimed, and explain how disclosure would damage
     interests protected by the claimed index.  See Citizens Comm'n on
     Human Rights v. FDA, 45 F.3d 1325, 1326 n.1 (9th Cir. 1994)
28   ("CCHR"), citing Bowen v. FDA, 925 F.2d 1225, 1227 (9th Cir. 1991

1

**STANDARD**

2

3       Most cases brought pursuant to the FOIA are resolved through
4   summary judgment.  <u>Cooper Cameron Corp. v. U.S. Dep't of Labor</u>,
5   280 F.3d 539, 543 (5th Cir. 2002).  Summary judgment is proper if
6   "the pleadings, depositions, answers to interrogatories, and
7   admissions on file, together with affidavits, if any, show that
8   there is no genuine issue as to any material fact and that the
9   moving party is entitled to a judgment as a matter of law."  Fed.
10  R. Civ. P. 56(c).  One of the principal purposes of Rule 56 is to
11  dispose of factually unsupported claims or defenses.  <u>Celotex</u>
12  <u>Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).
13      The agency responding to a FOIA request has the burden of
14  sustaining the adequacy of its response by demonstrating that it
15  did not improperly withhold records subject to disclosure under
16  FOIA.  5 U.S.C. § 552(a)(4)(B); <u>U.S. Dep't of Justice v. Tax</u>
17  <u>Analysts</u>, 492 U.S. 136, 142 n.3 (1989).  The agency must
18  "demonstrate that it has conducted a search reasonably calculated
19  to uncover all relevant documents."  <u>CCHR</u>, 45 F.3d at 1328,
20  quoting <u>Zemansky v. EPA</u>, 767 F.2d 569, 571 (9th Cir. 1985).  The
21  "issue to be resolved is not whether there might exist any other
22  documents possibly responsive to the request, but rather whether
23  the *search* for those documents was *adequate*."  <u>CCHR</u>, 45 F.3d at
24  1328 (emphasis in original).
25      An agency may demonstrate the adequacy of its search with
26  "reasonably detailed, nonconclusory affidavits submitted in good
27  faith."  <u>Zemansky</u>, 767 F.2d at 571.
28  ///

7

For purposes of summary judgment, affidavits describing the agency's search procedures are sufficient "if they are reasonably detailed in their description of the files searched and the search procedure, and if they are nonconclusory and not impugned by evidence of bad faith. <u>Id.</u> at 573.  Once an agency meets its initial burden in this regard, its position can be rebutted "only by showing that the agency's search was not made in good faith." <u>Maynard v. CIA</u>, 986 F.2d 547, 560 (1st Cir. 1993), citing <u>Miller v. U.S. Dep't of State,</u> 779 F.2d 1378, 1383 (8th Cir. 1985). Because agency affidavits are accorded a presumption of good faith, they cannot be rebutted by "purely speculative claims about the existence and discoverability of other documents." <u>Maynard</u>, 986 F.2d at 560, quoting <u>SafeCard Servs., Inc. v. SEC</u>, 926 F.2d 1197, 1200 (D.C. Cir. 1991).

**ANALYSIS**

Plaintiff takes issue with the adequacy of NASA's responses to his FOIA requests.  First, he contends that NASA's efforts to locate responsive information was not sufficiently comprehensive. Next, he identifies certain categories of documents which he claims should have been released but were not.  Finally, Plaintiff takes issue with the propriety of certain redactions NASA made to the documents that were provided to him.  Each of those contentions will be addressed in turn.

///

///

///

## 1. Adequacy of Search

Plaintiff describes NASA's method in locating responsive documents as "hit or miss", and asserts that NASA unreasonably relied on "informal" oral inquiries directed to key MER Project members for purposes of locating documents likely to fall within the purview of Plaintiff's informational requests. The Court is unpersuaded by those arguments.

NASA's Freedom of Information Act Officer at its Pasadena Management Office, Dennis B. Mahon, forwarded the two requests at issue in this litigation to JPL's Contract Manager, Jody Brown, upon their receipt. Ms. Brown, in turn, queried responsible employees associated with the MER Project regarding their knowledge of the existence or location of responsive documents. Not surprisingly, Ms. Brown determined through that consultation that only MER Project members would likely know about procedures for logging the receipt of data and images from the Rover. Brown Decl., ¶ 5. Although Mahon was initially told that no procedural manuals or instructions had been prepared for purposes of logging the data received from the Rover on Mars, once Mahon realized that logs themselves were also requested, she instituted another search. That search resulted in a conclusion that the DSN Network, which received the telemetry signals from the Rover, was the only likely source for responsive information as to the logs themselves. Brown Decl., ¶¶ 10-12.

///
///
///
///

1  According to Software Engineer Kyran Owen-Mankovich, the

2  telemetry information is stored on a DSN server which records and

3  associates the data, and he concluded following consultation with

4  the MER Project Manager that Plaintiff's request could be

5  interpreted to refer to that logging information.  Owen-Mankovich

6  Decl., ¶¶ 5-6.  Mr. Owen-Mankovich subsequently assembled this

7  information into text-file format for the Martian days requested,

8  and further generated a list of the APID codes which explained

9  the data's source.  Id. at ¶¶ 6-13.  As indicated above,

10 information from all seven scientific instruments on the Rover,

11 as well as its seven engineering cameras, was analyzed.[4]

12     In addition to this information, as indicated above MER

13 Project officials Steve Squyres, Ray Arvidsen, and David Lavery

14 further regarded the Spirit's PDL Reports as being potentially

15 responsive to Plaintiff's request for "logs recording the receipt

16 of data."  Lavery Decl., ¶ 50.  While that conclusion was

17 disputed by others on the MER Project staff, in the interests of

18 as comprehensive a disclosure as possible NASA ultimately decided

19 to release the PDL Reports.  Once that conclusion was reached,

20 the subject of logging procedures was further analyzed, and after

21 consulting with others it was determined that the MER Project

22 Documentation Library was the only place likely to contain

23 downlink procedure documents, which were in turn found to consist

24 only of certain PDL procedures.  Lavery Decl., ¶ 49, 50, 59, 62.

25 ///

26

27     [4] One of the engineering cameras, however, the Descent
   Imager, was inoperable during the time period encompassed by
28 Plaintiff's FOIA request.

10

1    The Library's Document Index was searched and, as indicated
2    above, eight documents were ultimately determined to be
3    responsive and produced following redaction.

4        The search for responsive documents, then, was done in
5    consultation with the MER Project's top experts, who identified
6    and participated in searching for documents likely to be
7    responsive.  While Plaintiff contends that NASA was obligated to
8    do a complete computer search in addition to drawing upon the
9    knowledge and guidance of these experts, there is no requirement
10   that an agency search all possible sources in response to a FOIA
11   request when it believes all responsive documents are likely to
12   be located in one place.  Oglesby v. U.S. Dep't of Army, 920 F.2d
13   57, 68 (D.C. Cir. 1990, citing Marks v. U.S. Dep't of Justice,
14   578 F.2d 261, 263 (9th Cir. 1978).  An agency may properly
15   explain by declaration or affidavit that records are not apt to
16   be found at other locations.  Id.  While Plaintiff takes issue
17   with the conclusions reached by top MER Project officials, it is
18   reasonable that those experts would have a solid grasp on the
19   receipt and processing of data transmitted from the Spirit Rover.
20   The Court agrees with NASA that its search in this case were
21   conducted by skilled persons working within well-defined sets of
22   data.  NASA was not required to search further in order to
23   satisfy its obligations under FOIA in this matter.
24   ///
25   ///
26   ///
27   ///
28   ///

**2.   Documents Alleged to Have Been Improperly Withheld**

In addition to challenging the adequacy of NASA's search itself, Plaintiff further identifies specific categories of documents he believes exist but were not provided. He believes that some substantive information was deleted for an "unidentified set of instruments." Opp'n, 21:12-14.   He further believes that Operations and Science Storage ("OSS") serves contain rover data and logs that has not been produced. Additionally, Plaintiff claims that a log book exists for one of the items on the Rover, the Moessbauer Spectrometer.   Because Plaintiff asserts that a log book indeed exists for the Spectrometer, he speculates that it is "reasonable to believe that similar log books exist for other instruments on the Rover." Opp'n, 25:26-28.   Finally, Plaintiff points to several other logs that he believes are mentioned in NASA documents but have not been produced.   Specifically, he cites the SDC and EVR logs as examples in that regard, and further argues that there are EDR "lists" of data and images received from Mars that should in fact have been disclosed as responsive logs.

NASA has adequately addressed each of these concerns. First, the logs of OSS activity do not record JPL's receipt of data from Mars, but instead record the process of subsequent data product generation.   See Supp. Lavery Decl., ¶ 9.   Consequently the OSS materials go beyond the scope of Plaintiff's FOIA request, which can only reasonably be read as encompassing logs recording receipt of data directly from the Spirit Rover to Earth.

///

12

1  Similarly, NASA has explained that both the EVR and SDC logs do
2  not record any activity responsive to Plaintiff's request for
3  logs recording the receipt of actual data from Mars.
4  NASA further explains that what Plaintiff refers to as missing
5  data for temperature and voltage sensors associated with the
6  PANCAM Camera are indeed included within the log records
7  pertaining to the PANCAM.  NASA also explains that the so-called
8  Moessbauer log book in fact merely states the settings of the
9  Moessbauer Spectrometer, is neither a log or a book, and
10  consequently is non-responsive as well.  See Supp. Lavery Decl.,
11  ¶ 5, 7, 9.  Finally, with respect to the alleged EDR lists, they
12  contain no facts concerning the process of taking the data
13  received from the Spirit Rover into possession.  Any reasonable
14  reading of Plaintiff's FOIA requests leads to the conclusion that
15  they hinge on that process.

16

17  **3.  Propriety of Redaction Procedures**

18      FOIA allows certain documents to be exempt from FOIA
19  disclosure.  Items "related solely to the internal personnel
20  rules and practices of an agency", for example, are exempted
21  under 5 U.S.C. § 552(b)(2). Subdivision (b)(2) covers not only
22  internal and generally trivial matters of no real interest to the
23  public (the so-called "low 2" exemption), but also items in the
24  "high 2" category posing a potential risk to agency security
25  should they be disclosed.  This latter category would include,
26  for example, information facilitating a computer hacker's access
27  to vulnerable agency databases, like file pathnames, keystroke
28  instructions, directory address and other internal information.

13

To that end, NASA redacted data from the information provided to Plaintiff that showed filepaths revealing the directory structure of the OSS, because such information could make it easier for an intruder to gain access to the OSS and destroy or falsify particular data.  See Decl. of Stephen L. McConnell, NASA's Chief FOIA Public Liaison Officer, ¶ 14.

The other FOIA authorized exemption stems from 5 U.S.C. § 552(b)(6), which allows the government to withhold all information about individuals in "personnel and medical files and similar files" if the disclosure of the information "would constitute a clearly unwarranted invasion of personal privacy." Mr. McConnell explains in his declaration that NASA redacted certain names, initials, email addresses and telephone numbers that could give members of the public identity or contact information for certain non-federal employees.  McConnell Decl., ¶¶ 20-21.  McConnell states that he balanced the privacy interest of the individuals about whom information was redacted with the public interest in disclosure of the information before determining that the privacy interests predominated.  Id. at ¶ 23.  These redactions, along with the "high 2" redactions enumerated above, were detailed in a Vaughn Index spreadsheet prepared by McConnell showing the page number, an entry number within the page, the FOIA exemption number or numbers, and a description of the redacted material.  Lavery Decl., ¶ 66; McConnell Decl, ¶ 12 and Exh. 4.

///

///

///

14

NASA has explained how the redactions in question contain private information about the authors of the PDL Reports, their replacements on the next shift, and third parties involved in the payload downlink process, information that could be abused in various ways through unwanted solicitation and the like. Information need not be intimate or embarrassing to qualify for exemption under subdivision (b)(6).  U.S. Dep't of State v. Washington Post Co., 456 U.S. 595, 600 (1982).  The fact that Plaintiff would not abuse private information obtained about the concerned individuals is irrelevant since information released under FOIA is in effect released to the world.  See Maricopa Audubon Soc'y v. U.S. Forest Serv., 108 F.3d 1082, 1088-89 (9th Cir. 1997).

The Court believes that NASA has adequately supported, through release of a Vaughn Index, the propriety of redactions to the information provided to Plaintiff under his FOIA request.

///
///
///
///
///
///
///
///
///
///
///
///

**CONCLUSION**

For all the foregoing reasons, the Court concludes that NASA properly complied with the two FOIA requests that are the subject of this lawsuit.  As such, NASA is entitled to summary judgment in its favor.  The Clerk of the Court is hereby directed to close this file.


IT IS SO ORDERED.


DATED: December 21, 2006

_____
MORRISON C. ENGLAND, JR
UNITED STATES DISTRICT JUDGE

16